**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY**

| | |
|---|---|
| PORT ROYAL SEAFOOD, INC., and CJ SEAFOOD, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| M/V LACYE BRYN, her engines, tackle apparel, equipment, appurtenances, etc., <u>in rem</u>, | ) ) ) ) |
| Defendant. | ) ) ) |

C.A. NO.: 2:07-1633-PMD

**AMENDED
FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

This matter was tried without a jury on January 20, 2009. The Court--having heard the arguments, read the briefs of counsel, and considered the evidence including courtroom testimony of witnesses, deposition testimony, and exhibits--makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. A Verified Complaint in the above captioned matter was filed on June 12, 2007 stating a cause of action of breach of maritime contract and execution of maritime lien against the named vessel and all ancillary and appurtenant property. Service was effected on the vessel by the United States Marshal on June 15, 2007 at which time the vessel was taken into the Marshal's custody pursuant to an Order of this Court dated June 13, 2007.

2. Notice of the pendency of this litigation and the arrest of the vessel was then given by certified mail to those persons shown on the United States Coast Guard Abstract of Title as potentially claiming an interest therein, including A.C. Christopher Seafood, Inc. and

Charles Abner (hereinafter collectively referred to as "Abner").  Such service was received by Abner on July 7, 2007.

       3.      Abner appeared in this litigation on July 24, 2007 by filing an Answer denying the allegations of the Verified Complaint.  On August 17, 2007, Mr. James H. Moss of Moss, Kuhn, and Fleming, P.A. advised the Court that his firm was undertaking the representation of Abner and refiled Abner's prior Answer with an attached Verification.  Mr. Moss has subsequently appeared on behalf of Abner at motion hearings and in correspondence with the Court.

       4.      When no effort was made to secure the release of the vessel by posting a bond or other security, the Plaintiffs moved on August 7, 2007 for the interlocutory sale of the vessel and all ancillary and appurtenant property pursuant Rule E(9)(d) of the Supplemental Admiralty Rules.  On September 20, 2007, this Court conditionally ordered that the vessel and all ancillary and appurtenant property be sold by the United States Marshal at public auction following published notice of the sale.  This conditional order was confirmed by written Order of November 7, 2007 and the vessel was sold, with Abner in attendance, for $20,000.00.

       5.      This sale was subsequently confirmed by an Order dated November 15, 2007 and the proceeds thereof were presently deposited in the registry of the Clerk of the District Court.  Of these funds, $8,360.14 was disbursed by Order of this Court dated January 3, 2008 for the expenses of the substitute custodian and costs of sale.  Accordingly, the sum of $11,639.86, together with accrued interest, remains in the registry of the Court representing a substitute res subject to any valid liens which were pending against the Defendant vessel at the time of sale.

6. The Plaintiffs Port Royal Seafood, Inc. and CJ Seafood, Inc. are both corporations organized and existing under the laws of the State of South Carolina.

7. The M/V *Lacye Bryn* ("the vessel") is a commercial fishing boat, which, since at least January 2000, had been docked by its owners at the premises of Port Royal Seafood, Inc. During this period, this dockage has been governed by a posted notice providing for a daily dockage charge of $25.00 for vessels which have not unloaded seafood at Port Royal Seafood during the preceding week.

8. No one fished the vessel from May 2006 until the filing of this action and no seafood was unloaded at the Plaintiff's dock during that time. Based on the daily rate stipulated in the posted notice, the dockage fees for the relevant period total $7,125.00.

9. As set forth below, the vessel was removed from the dock by CJ Seafood to effect repairs to its bottom and to prevent it from sinking. It was necessary to haul the boat out of the water by means of the marine railway owned and operated by CJ Seafood in order to make these repairs. The vessel was subsequently returned to its prior location.

10. Commencing on approximately October 22, 2006, as the vessel was sitting idle at the Port Royal dock, it began taking on water at an alarming rate due to rotting wood in the hull. Port Royal Seafood repeatedly used its own pumps and fuel and purchased additional equipment in an attempt to keep the boat afloat. While these efforts were partially successful, the engine room became completely inundated on multiple occasions.

11. The fair market value of these goods and services provided by Port Royal to the vessel total $16,638.98.

12. Based on the foregoing an invoice was generated by Port Royal in the amount of $23,763.98 against the vessel. This invoice was never paid.

13. To prevent the boat from completely sinking, Port Royal requested CJ Seafood to repair the boat. CJ Seafood hauled the boat on its marine railway and cleaned and inspected the bottom. This revealed several holes where wooden dowels had rotted or were eaten by marine worms as well as other damage. This damage was repaired and the bottom repainted.

14. After restoring the boat to a seaworthy condition, it was returned to the Port Royal dock. CJ Seafood generated an invoice for its services in the amount of $15,475.00. This invoice was never paid.

## **CONCLUSIONS OF LAW**

1. This Court has jurisdiction over this admiralty and maritime case pursuant to 28 U.S.C. § 1333. " '[C]ontracts to repair and store vessels fall within the Court's admiralty jurisdiction, whether the vessels are kept on land or in the water. The key to jurisdiction is not the location of the vessel, but whether the contract sought to be enforced impacts maritime commerce.' " *Mahony v. Lowcountry Boatworks, LLC*, 465 F. Supp. 2d 547, 550 (D.S.C. 2006) (quoting *AXA Re Property & Cas. Ins. Co. v. Tailwalker Marine*, 2004 WL 3680276 at *3 (D.S.C. 2004) (in turn quoting *Commercial Union Ins. Co. v. Used Boat Haven*, 1996 WL 191960 (S.D.N.Y. 1996))); *see also Sisson v. Ruby*, 497 U.S. 358, 367 (1990) ("[N]avigation, storing and maintaining a vessel at a marina on a navigable waterway is substantially related to traditional maritime activity.").

2. While Abner has asserted that this court lacks jurisdiction because the vessel had been "taken out of navigation," this claim fails as a matter of law. Abner is essentially arguing

that this court lacks jurisdiction due to the "dead ship doctrine," but that doctrine has only been applied in cases where the function of a ship has so fundamentally changed that it can no longer even be said to be a seagoing vessel. *See, e.g.*, *In re Queen Ltd.*, 361 F. Supp. 1009 (E.D. Pa. 1973). "[I]t is generally accepted that a vessel does not cease to be a vessel when she is not voyaging, but is at anchor, berthed, or at dockside." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 373 (1995). Here, there is no dispute that the *Lacye Bryn* was a vessel fully capable of sea navigation at the time it was initially tethered to the dock, and therefore, the dead ship doctrine does not apply to the facts of this case.

3. Under the Federal Maritime Lien Act ("FMLA"), "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—(1) has a maritime lien on the vessel; (2) may bring a civil action in rem to enforce the lien; and (3) is not required to allege or prove in the action that credit was given to the vessel." 46 U.S.C. § 31342.

4. The FMLA expressly "supersedes any State statute conferring a lien on a vessel to the extent the statute establishes a claim to be enforced by a civil action in rem against the vessel for necessaries." 46 U.S.C. § 31307. Therefore, § 29-9-10 of the South Carolina Code is inapplicable and irrelevant.

5. The FMLA further provides that "[t]he following persons are presumed to have authority to procure necessaries for a vessel: (1) the owner; (2) the master; (3) a person entrusted with the management of the vessel at the port of supply . . . ." 46 U.S.C. § 31341(a).

6. "[D]ockage services . . . have been deemed necessaries [for purposes of this Act]." *Loginter S.A. Y Parque Inds. Agua Profunda S.A. Ute. V. M/V NOBILITY*, 177 F. Supp. 2d 411, 414 (D. Md. 2001): 1 T. Schoenbaum, *Admiralty and Maritime Law* 530 (4th ed. 2004).

7.      In this instance, the vessel was docked for years at the Plaintiff's facility with the full knowledge of its former owner, Joseph Spears, as well as Abner and all others charged with its operation.  Consistent with the posted notice, all such persons were also aware that this dockage was not being provided gratuitously, but was subject to the condition that product was being offloaded on a weekly basis.  As there is no dispute that this requirement was not fulfilled for more than a year, the dockage charges accrued and a necessaries lien subsisted against the vessel.

8.      When the vessel began taking on water and the engine room began flooding, Port Royal Seafood was unable to either clarify the ownership status of the boat or to locate anyone willing to take responsibility for it.  Its landlord, the State Ports Authority, advised it that it would be held responsible if the boat sunk and caused damage to either the facility or the environment.  Given these considerations, Port Royal convinced CJ Seafood to intervene and repair the boat.

9.      These services rendered by both Port Royal and CJ Seafood qualify as necessaries under the Act and were provided at the instance of "a person entrusted with the management of the vessel at the port of supply."  Thus, Port Royal and CJ Seafood should enjoy a necessaries lien for the vessel repairs.

10.     Even were Port Royal and CJ Seafood not entitled to a lien for necessaries, they would be entitled to a lien for salvage.

11.     "The formal elements of a valid salvage claim under the general maritime law are well-known: (1) there must be a marine peril placing the property at risk of loss, destruction or deterioration; (2) the salvage service must be voluntarily rendered and not required by an

existing duty or special contract; and (3) the salvage efforts must be successful in whole or in part." 2 T. Schoenbaum, *Admiralty and Maritime Law* 165 (4th ed. 2004). Here, the vessel was undeniably subject to a marine peril in that it was sinking prior to the services rendered by Port Royal and CJ Seafood. These Plaintiffs had no preexisting duty to pump, haul, or repair the boat. Furthermore, these services were obviously successful in that the vessel's hull was staunch and sound following the repairs and in no danger of sinking. Accordingly, these Plaintiffs are entitled to a salvage award.

12.     The factors relied upon by courts in determining salvage awards were originally set out in *The Blackwall*, 77 U.S. (10 Wall.) 1, 14, 19 L.Ed. 870 (1869). They are: (1) the labor expended by the salvors in rendering the salvage service; (2) the promptitude, skill, and energy displayed in rendering the service and saving the property; (3) the value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed; (4) the risk incurred by the salvors in securing the property from the impending peril; (5) the value of the property saved; and (6) the degree of danger from which the property was rescued. *See R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel*, 286 F.3d 194, 203 (4th Cir.), *cert. denied*, 537 U.S. 885 (2002).

13.     Here, the vessel was in imminent risk of sinking with the consequent danger to the hull and all machinery onboard. Plaintiffs devoted the use of their property, including their pumps, fuel and marine railway, to the accomplishment of lengthy repairs. Considerable labor was expended during the course of these repairs to the benefit of the quality of the final product.

14.     Because of these factors, Port Royal and CJ Seafood should be entitled to a salvage award in an amount at least equal to the cost of the repairs.

15.     As recognized in this Circuit, "[t]he principal method of enforcing a salvor's award is through the recognition of a salvor's lien in the property saved. This maritime lien arises from the moment salvage service is performed, and, as with any other lien, secures the payment of the as-yet-to-be-determined salvage award." *R.M.S. Titanic*, 286 F.3d at 203.

16.     Therefore, any compensation due to the Plaintiffs for their salvage of the vessel was secured by a lien thereon and, after the judicial sale, on the substitute res in the registry of this court.

17.     Port Royal Seafood, Inc. has a lien on the substitute res in the amount of $23,763.98. CJ Seafood, Inc. enjoys a lien totaling $15,475.00. Since the Plaintiffs have stipulated they will split the substitute res evenly, it is unnecessary for this Court to determine any priority issues.

18.     While both sides at trial spent substantial time and energy disputing whether or not Abner was actually the proper owner of the boat during the time in question, the only issue before the Court is which party is entitled to the remaining funds from the auction of the *Lacye Bryn*. As detailed above, Plaintiffs had a maritime lien on the vessel regardless of who the proper owner was. Therefore, the court need not and does not decide the issue of whether Abner had legally completed his purchase of the *Lacye Bryn* at the time of the events in question.

## **CONCLUSION**

It is therefore **ORDERED**, for the foregoing reasons, that judgment be entered for Plaintiffs Port Royal Seafood, Incorporated and CJ Seafood in the sum **$11,639.86**, together with interest accrued since the sale of the vessel was finalized.

**AND IT IS SO ORDERED**.

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**February 25, 2009**

9